Being unable to agree with the majority, I respectfully dissent.
Basically, the majority, in adopting the magistrate's decision, finds no fault with the magistrate's interpretation of the evidence regarding the issue of temporary total disability. The problem with the majority's conclusion is that it is the commission that exercised its broad discretion and exclusive authority in determining relator was not entitled to compensation. And, this was done based upon the evidence of record.
Relator's treating physician released him to return to work on November 6, 2000. The employer acknowledged that relator could return to work on that date with an accepted weight restriction. Relator did not report to work as scheduled. A Dr. Ruch, relied upon by relator, later certified temporary total disability from May 29, 1999 to March 1, 2001. Dr. Ruch mentioned a condition in her report of carpal tunnel syndrome. This condition was not an allowed condition in relator's claim. The bureau sent Dr. Ruch a letter asking for an explanation regarding her reference to a nonallowed condition. Dr. Ruch did not respond.
It requires no citation to emphasize that it is claimant's burden to submit proof of disability. It also requires no citation to emphasize the commission has exclusive authority to evaluate evidence and credibility. My review of the record does not reveal that relator met his burden and I would agree with respondent-commission in objecting to the magistrate's decision that disagreement with the manner in which the commission evaluated the evidence is not a sound basis to find an abuse of discretion in this case warranting relief by way of mandamus. I therefore dissent.
 APPENDIX A IN MANDAMUS
In this original action, relator, John P. Ignatious, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him temporary total disability ("TTD") compensation and to enter an order granting said compensation.
Findings of Fact:
1. On May 24, 1999, relator sustained an industrial injury while employed as a "tool crib attendant" for respondent Transdigm, Inc. and Aero Products ("Transdigm"), a state-fund employer. The industrial claim is allowed for: "Sprain of neck; herniated disc C4-5, herniated disc C5-6," and is assigned claim No. 99-422726.
2. On May 30, 2000, claimant underwent a C5 corpectomy performed by Teresa D. Ruch, M.D. The surgery was related to the industrial claim. Relator was off work following the surgery and received TTD compensation.
3. On October 20, 2000, relator made his third post-operative visit to the offices of Dr. Ruch. There are two office notes of that date stating:
 * * * At his last office visit which was 8/18/2000 he was complaining of a cold sensation in his right hand and some numbness and tingling in his left hand, also a cotton ball sensation in his throat. At this time all these symptoms have decreased. He's been going to physical therapy, his last visit was a week ago. * * *
 * * * He would like to go back to work as he's feeling much better. We're going to send him back to work with a 25 pound weight restriction the week after next and I'll see him again in three months. His x-ray looks fine.
4. On October 20, 2000, Dr. Ruch issued a written release stating that relator could return to "regular work effective November 6, 2000" with a "25 lb weight restriction."
5. A Transdigm memorandum dated October 23, 2000, indicates that Transdigm will accommodate relator's return to work.
6. On October 24, 2000, relator was examined on behalf of the Ohio Bureau of Workers' Compensation ("bureau") by Robert H. Anschuetz, M.D. Dr. Ancshuetz wrote:
 John Ignatious was injured at work on 5/24/99. He was working in a tool crib when he was struck on the left side of his chest by a drawer. Within ten days he developed significant neck and left arm pain. Eventually he did require surgery for herniated discs at C4-5 and C5-6. That surgery was carried out by Dr. Ruch at Lake Hospital on 5/30/00. He had previously been treated conservatively but he did experience too much pain and left arm dysfunction, so surgery became necessary to relieve the pressure on the nerves in his cervical spine.
 After the surgery on 5/30/00 he progressed satisfactorily. He did wear a cervical collar for about four weeks and then he was on significant restricted activity. Recently he has been going for physical therapy for three weeks and has improved in terms of his overall strength. He still has some dysesthesia in the left hand that involves his hand "like a glove." With his right hand he experiences mild pain as well.
 On physical examination the operative incision was on the right side of his neck and measured 7cm in length. It is well healed.
 With range of motion his flexion and extension and bending and turning side to side is approximately twenty-five percent of normal. He has a feeling of stiffness and mild discomfort especially with extension. His motor exam of the upper extremity is normal. Deep tendon reflexes are normal. Hoffman reflexes are normal. Sensory examination show decreased pinprick in the right thumb and index fingers only.
* * *
 I was able to review the MRI scan done prior to surgery that shows the herniated disc as well as recent x-rays that show the C5 corpectomy progressing well with fusion with good maintenance of position with the plate and screws as well as the bone graft segment.
* * *
 John Ignatious is recovering well after surgery for herniated disc and osteophytes compressing the spinal cord at C4-5 and C5-6.
With respect to specific questions:
 1. The injured worker has not reached maximum medical improvement. He can be expected to continue to improve in overall strength and endurance over the next three to six months as he returns to his work activities.
 2. The treatment to date has been necessary and appropriate.
 3. Vocational rehabilitation is not indicated at this time. It could be a consideration at a later time if he is not able to successfully return to his usual employment.
 4. The injured worker can return to his former position of employment as scheduled on 11/6/00. The restrictions on his activities of lifting no more than twenty-five pounds to begin with are appropriate.
7. Relator did not return to work at Transdigm on November 6, 2000, or thereafter.
8. On November 15, 2000, relator underwent another MRI of the cervical spine at Dr. Ruch's request. The MRI report from Meredith A. Weinstein, M.D., states:
 IMPRESSION: When compared with the previous examination of 5/17/00 the patient is status interior intra body fusion of C4 through C6.
 There are mild to moderate-sized areas of increased signal intensity within the spinal cord at the level of the C4-5 disc representing either areas of spinal cord contusion or infarction at the site of the patient's previous spinal cord compression.
* * *
 Findings of moderate to marked impingement upon the neural foramina of the right and left C5 and C6 nerve roots. The visualization of those neural foramina is not optimal because of artifacts related to the patient's anterior cervical fusion and the degree of neural foraminal impingement may appear greater because of this artifact.
 Specifically, there has been resolution of the spinal cord compression visualized on the previous examination.
9. On November 20, 2000, relator visited Dr. Ruch at her office. Dr. Ruch wrote:
 John Ignatious was seen in the office today. He had complained of pain in his hand and arm, occasional pain in his neck when he goes backwards and forwards and could not go back to work. We had an EMG nerve condition study done which shows he has bilateral carpal tunnel. He is complaining of pain in his hand. All the fingers are numb. He has pain coming down from the elbow to the little and long fingers of his right hand. The left hand seems to be fine. We did repeat the MRI scan which shows lots of screw artifact. There are changes in the spinal cord from the previous spinal cord impingement. There are some things on there that I absolutely cannot say because of the screw artifact, but basically his graft looks like it is in good position and his spinal cord looks decompressed. His EMG nerve conduction study shows bilateral carpal tunnel. I think that he has that as well as tendinitis of his right hand which is keeping him from using his hand effectively. He is still having some pain in his neck on movement and positioning which I do think is secondary to the surgery. At this point we are going to try some occupational therapy to work with the hand, give him wrist splints at night and give him some Naprosyn to take. He is going to continue to take his Soma. The carpal tunnel he has I am sure is related to multiple repetitive activities and work related injury.
10. On November 28, 2000, Dr. Ruch completed a C-84 on which she certified temporary total disability from the date of injury to an estimated return-to-work date of March 1, 2001. The C-84 form asks the attending physician:
 Is the injured worker able to return to this position of employment?
 Is the injured worker able to return to other employment including light duty, alternative work, modified work or transitional work?
 Please explain, listing any restrictions that may apply. Attach additional sheet if necessary.
In response to the above queries, Dr. Ruch marked the "No" boxes and thereafter wrote "See Transcription," an apparent reference to her typewritten office notes.
The C-84 form also asks the attending physician:
 List ICD-9 Codes with narrative diagnosis(es) for allowed conditions being treated which prevent return to work.
In response to the above query, Dr. Ruch wrote:
722.0
722.71
The C-84 form asks the attending physician:
 List ICD-9 Codes with narrative diagnosis(es) for other allowed conditions being treated.
In response to the above query, Dr. Ruch wrote:
354.0
11. The following ICD Codes are taken from the International Classification of Diseases, 9th Revised, Clinical Modification, Sixth Addition (ICD-9 CM) as are pertinent to this action:
722.0 Displacement of cervical interverterbral disc without myelopathy.
722.71 Interverterbral disc disorder with myelopathy cervical region.
354.0 Carpal tunnel syndrome.
12. On December 1, 2000, a bureau "claims specialist" wrote to Dr. Ruch regarding her C-84:
 * * * The Claims Specialist is trying to clarify the change regarding the return to work from 11-20-2000 [10-20-00] to 11-28-2000. As the claim is not allowed for bilateral carpal tunnel, please advise what the changed circumstances are from 11-20-2000 [10-20-00] to 11-28-2000.
13. On December 15, 2000, Dr. Ruch wrote in her office notes:
 Mr. Ignatious' records were sent to me and they state he has fibromyalgia and a cervical whiplash syndrome. I don't think this is the cause of his current neck pain. I think that his fibromyalgia and whiplash were most likely due to the cervical disc herniations that he had and his new problem is from his cervical disc. Now he is post surgery.
14. On January 9, 2001, Dr. Ruch completed another C-84 in an apparent response to the December 1, 2000 letter from the bureau's claims specialist. The January 9, 2001 C-84 again certified temporary total disability from the date of injury to an estimated return-to-work date of March 1, 2001. Again, the C-84 form poses the following query to the attending physician:
 Is the injured worker able to return to this position of employment?
 Is the injured worker able to return to other employment including light duty, alternative work, modified work or transitional work?
In response to the above queries, Dr. Ruch again marked the "No" boxes but thereafter wrote: "Neck Pain."
Again, the C-84 form poses the following query to the attending physician:
 List ICD 9 Codes with narrative diagnosis[es] for allowed conditions being treated which prevent return to work.
In response to the above query, Dr. Ruch wrote:
847.0
722.0
15. The ICD Code 847.0 identifies the allowed condition "Sprain of Neck."
16. Following a January 30, 2001 hearing, a district hearing officer ("DHO") issued an order denying relator's request for TTD compensation. Relator administratively appealed.
17. Following a March 14, 2001 hearing, a staff hearing officer ("SHO") issued an order denying TTD compensation. Relator administratively appealed the SHO's order.
18. Following a May 21, 2001 hearing before a commission deputy, the deputy issued an order vacating the SHO's order. The deputy's order states:
 The Deputy orders that the claimant's request for temporary total compensation be denied.
 Claimant's attending physician and surgeon faxed a return to work slip to the employer on 10/20/2000 indicating a return to work of 11/06/2000 with restrictions. The employer in turn notified the claimant that they were "looking forward" to his return on that date and would make the accommodations necessary to comply with Dr. Ruch's 25 pound weight restriction. The claimant however did not return to work on that date and has in fact not returned as of the date of this hearing.
 The claimant testified at hearing that he experienced an exacerbation of his symptoms shortly before this scheduled return to work date (possibly due to sleeping incorrectly) and that he was unable to return to work. He indicated that he informed Dr. Ruch of this episode and was prescribed medication and scheduled for an appointment. Dr. Ruch re-evaluated the claimant on 11/20/2000 and completed another C-84 report dated 11/28/2000 in which she disabled the claimant through 03/01/2001 (Dr. Ruch incorporated by reference a notation to see her transcription records which focused on claimant's carpal tunnel syndrome, a non-allowed condition of the claim). Dr. Ruch completed yet another C-84 on 01/09/2001 and attempted to rectify the muddled situation by changing the allowed diagnostic codes and certifying disability for the correct conditions. This opinion was also verified again by Dr. Ruch in a report dated 05/18/2001.
 The Deputy finds that the claimant's request for further compensation is not supported by the evidence. The original C-84 dated 11/28/2000 is based on a non-allowed condition as the doctor's own office notes from that date indicate that claimant's problems are due to carpal tunnel syndrome. Further, Dr. Ruch does not explain why she changed her opinion as to the claimant's underlying disability in the 01/09/2001 C-84 report. The claimant testified that he experienced an aggravation of symptoms, however Dr. Ruch makes no mention of this or any other reason for the change. On 10/20/2000, she found that the claimant was doing well and ready to go back to work.
 The Deputy further notes that the Bureau of Workers' Compensation had the claimant examined on 10/24/2000 by Dr. Anschuetz who concurred with Dr. Ruch's 10/20/2000 office evaluation that the claimant could return to work with restrictions.
 The Deputy orders that the claimant's request for further temporary total compensation be denied based on the 10/24/2000 report of Dr. Anschuetz and the 10/20/2000 office record of Dr. Ruch.
 The Deputy finds that Dr. Ruch's C-84 report of 11/28/2000 is based on a non-allowed condition as evidenced by her office record and further finds that inexplicably Dr. Ruch fails to give a basis for the "about-face" in her medical opinion.
18. On August 23, 2001, relator filed this mandamus action.
Conclusions of Law:
It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
A claimant must always show the existence of a direct and proximate causal relationship between his or her industrial injury and the claimed disability. State ex rel. Waddle v. Indus. Comm. (1993),67 Ohio St.3d 452. Nonallowed medical conditions cannot be used to advance or defeat a claim for compensation. Id.
The mere presence of a nonallowed condition in a claim for TTD compensation does not itself destroy the compensability of a claim, but the claimant must meet his or her burden of showing that an allowed condition independently caused the disability. State ex rel. Bradley v. Indus. Comm. (1997), 77 Ohio St.3d 239, 242.
Contrary to what is strongly suggested by the commission deputy, Dr. Ruch's November 28, 2000 C-84 does not certify TTD based even in part upon carpal tunnel syndrome (ICD-9 Code 354.0). The deputy seems to have failed to understand the distinction between the separate queries on the C-84 asking the doctor to (1) list ICD-9 Codes with narrative diagnoses for allowed conditions being treated which prevent return to work, and (2) list ICD-9 Codes with narrative diagnoses for other allowed conditions being treated. (Emphasis added.)
Dr. Ruch listed ICD-9 Code 354.0 as a condition being treated, not as a condition which prevents return to work.
Accordingly, to hold that Dr. Ruch's listing of ICD-9 Code 354.0 on the November 28, 2000 C-84 indicates her reliance upon a nonallowed condition in certifying TTD is to simply misread Dr. Ruch's responses to the C-84 queries.
Dr. Ruch did complete another C-84 dated January 9, 2001, in an apparent response to the bureau's December 1, 2000 letter. The C-84 dated January 9, 2001, undisputedly lists the ICD-9 Codes for the allowed conditions as the conditions preventing the return to work. However, on the January 9, 2001 C-84, Dr. Ruch deleted carpal tunnel syndrome as a condition being treated presumedly because the bureau's December 1, 2000 letter suggests that it was improper to list carpal tunnel syndrome as a condition being treated.
Contrary to the deputy's suggestion, the January 9, 2001 C-84 is not an "about face" as to the conditions being certified as preventing the return to work. That Dr. Ruch was treating relator for carpal tunnel syndrome, a nonallowed condition, cannot, under Waddle, supra, preclude TTD compensation based upon one or more allowed conditions of the claim.
Contrary to the deputy's suggestion, there is indeed medical evidence that can explain why relator might have been unable to return to work due to an allowed condition on November 6, 2000, even though Dr. Ruch had released relator to return to work for that date. The November 15, 2000 MRI report indicates "increased signal intensity" at the site of the presurgical spinal cord compression. On December 15, 2000, Dr. Ruch wrote in an office note that relator's "new problem is from his cervical disc." On the C-84 dated January 9, 2001, Dr. Ruch indicated that "Neck Pain" prevented relator from not only returning to his former position of employment but also from performing even light duty alternative work.
In short, the deputy's May 21, 2001 order strongly suggests that the decision to deny TTD compensation was premised upon a misreading of the medical reports as well as a misunderstanding of Waddle, supra, and its progeny.
Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate the May 21, 2001 order of its deputy and to enter a new order consistent with this magistrate's decision that either grants or denies the request for TTD compensation.